## THE GOVERNOR WARFIELD.

### THE RICHARD PECK.

#### No. 10257.

District Court, E. D. New York.
Feb. 25, 1930.

Foley & Martin, of New York City (W. J. Martin, of New York City, of counsel), for Arundel Corporation.

Haight, Smith, Griffin & Deming, of New York City (Henry M. Hewitt and James Mc-Kown, Jr., both of New York City, of counsel), for New England S. S. Co.

GALSTON, District Judge.

The libel against the steamer Richard Peck and the cross-libel brought by the New England Steamship Company, as the owner of the steamer Richard Peck, against the dredge Governor Warfield, owned by the Arundel Corporation, arise out of a collision which occurred on March 12, 1927, at about 6:35 a. m., between the dredge Governor Warfield, then engaged in the performance of a United States government contract, while digging on the Middle Reef area of Hell Gate, East River, and the steamer Richard Peck, as the latter proceeded down the East River on an ebb tide and collided with the dredge.

It is claimed, on the one hand, that the Richard Peck failed to take consideration of the set of the tide and also passed the dredge on that side prohibited by the regulations of the War Department.

On the other hand, the cross-libel alleges that the dredge was not sounding the regulation fog signals and that no timely notice was given to the Richard Peck of the fact that the Governor Warfield was on the operating area from which she had for a time been absent.

Contradictory versions of the following circumstances appear in the testimony:

(1) As to the density of the fog which prevailed at or about the time of the collision.

(2) As to whether fog bells were sounded on the Governor Warfield.

There is agreement, however, on the course which the Richard Peck steered and the rate of speed at which she proceeded. Both of these circumstances are helpful in reaching a conclusion as to the probable occurrence.

On the night of March 11, 1927, the Richard Peck, a passenger and freight steamer plying on the Sound, left New London, Conn., bound on her regular trip for New York. On the morning of March 12th she encountered fog and lay off North Brother Island for a period of about twenty minutes. The fog having lifted, she continued on her way, passing under Hell Gate Bridge at about 6:33 a. m. Passing Negro Point and headed for Hallets Point, she was subsequently steered between Mill Rock and the Astoria shore below Hallets Point. In the last maneuver her starboard quarter struck the port side aft of the dredge. The collision took place at about 6:35 or 6:37 a. m.

It appears that the distance from Little Hell Gate to the dredge was about seventy-two hundred feet. This distance was covered by the Richard Peck in six minutes, inasmuch as she passed Little Hell Gate at 6:31 a. m., or at the rate of eleven and a half miles per hour. Thus she was traveling at the rate of twelve hundred feet a minute during the six minutes preceding the collision. Her speed is indicated also by the distance she traveled from the Hell Gate Bridge which she passed at 6:33. The distance from Hell Gate Bridge to the dredge was forty-four hundred feet, or eleven hundred feet per minute.

That a speed of eleven and a half miles per hour was excessive seems to be indicated by the admissions of the captain of the Richard Peck. He was asked in cross-examination:

"Q. You don't claim 7 miles would be a moderate speed coming down there in this heavy fog? A. About fair coming down with a fair tide. That tide runs 5 or 6 miles an hour down there. We cannot go that speed all the time in fogs.

"Q. You don't consider 7 miles an hour would be a moderate speed where you can see only 100 feet ahead of you? A. Take a fair tide, that is the best you can do. If you have a tide 5 or 6 miles under you, you have got to

do something to overcome that. You have got to have a little speed.

"Q. Three miles with the tide and 3 miles with your own steam? A. Yes.

"Q. That would be the excess speed you would want to go at? A. Yes, sir.

"Q. Anything more than that would be dangerous? A. Yes, sir."

From the report of the United States inspector, the tide was ebb with a velocity of approximately three knots.

There is only one inference to be drawn from the rate of speed, and that is that the visibility was not limited to one hundred or one hundred and fifty feet, as testified to by the Richard Peck witnesses, but was far greater. Fortunately in the interest of truth we have the testimony of a disinterested witness. Henry E. DuBois, an inspector in the engineering branch of the War Department, was assigned to the Governor Warfield at the time in question, as a representative of the government. In the report which he made of the collision for the government, he stated: "Weather foggy, visibility approximately 1000 feet."

Now as to the ringing of the fog bells: All of the witnesses who were on the Richard Peck, with the exception of the quartermaster, Foss, say they heard no bell sounded on the Governor Warfield prior to the collision. Foss at first said he heard a bell, and then when he was recalled said he did not hear a bell at the time of contact. The Richard Peck witnesses are contradicted flatly by those on board the Governor Warfield, all of whom testified that the fog bell was sounded. Again the testimony of the disinterested witness DuBois is of importance. He said that he got up at 5 o'clock in the morning when the dredge started to work and that the fog bell had been ringing on and off right along ever since from that hour.

Finally, on the question of notice, it does not appear that the New England Steamship Company, the owner of the Richard Peck, had actual notice, until one of its officers on the morning of March 12th opened his mail; but the fact remains undisputed that the War Department sent out notices dated March 10, 1927, informing navigators that dredging and rock removal operations in Middle Reef Hell Gate would be resumed on or about March 11, 1924. The proof likewise shows that in the New York Herald-Tribune, in the issue of March 11, 1927, under Notice to Mariners, appeared the following notice:

"Navigators are notified that commencing March 11th, 1927, the Dredge Warfield will resume dredging operations in Middle Reef, East River, New York.

"The Arundel Corporation."

Moreover, while it is true that the Governor Warfield had been off the area for seven or eight days, nevertheless there had been dredges working in Middle Reef, as admitted by Captain Barrett, more than five years. He knew that when a dredge was at work he had to take a course between Middle Reef and Mill Rock. The regulations provide:

"2. All vessels and other water craft passing through Hell Gate shall give as wide a berth as practicable to any floating plant under operation therein for channel improvement, either by the United States or by any contractor under the authority and supervision of the United States, and shall in no case pass closer to said plant than 100 feet."

"7. During the continuation of work on Middle Reef, west bound tows and car-floats, when going through the Gate at ebb tide, shall pass between Mill Rock and Wards Island, and around to the westward of Mill Rock; west bound steamers proceeding under their own steam, or under their own steam assisted by tugs alongside, shall pass between the dredging plant on Middle Reef and Mill Rock or to the westward of Mill Rock."

In the circumstances it seems to me that the collision arose out of the undue speed which the Richard Peck was making, which, perhaps, added to the set of the tide, made it difficult for her to follow that course which safety indicated and the regulations prescribed.

The libelant, Arundel Corporation, the owner of the dredge Governor Warfield, may have a decree sustaining its libel. The cross-libel of the New England Steamship Company, owner of the steamship Richard Peck will be dismissed.